### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SEARS AUTHORIZED HOMETOWN STORES, LLC, *et al.*,[1] | ) Case No. 22-11303 (LSS) |
| | ) |
| | ) Joint Administration Requested |
| Debtors. | ) |

## DECLARATION OF ELISSA ROBERTSON IN SUPPORT OF FIRST DAY RELIEF

I, Elissa Robertson, hereby declare under penalty of perjury that the following (this "**Declaration**") is true to the best of my knowledge, information and belief:

1.    I am the chief executive officer ("**CEO**") of Sears Authorized Hometown Stores, LLC and Sears Hometown Stores, Inc. (together, the "**Debtors**"), the debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.    As described in greater detail herein, Debtors Sears Hometown Stores, Inc. ("**SHS**") and Sears Authorized Hometown Stores, LLC ("**SAHS**") operate "Sears Hometown Stores," a national retailer primarily focused on selling home appliances, hardware, tools, and lawn and garden equipment.  As of the Petition Date, the Debtors and their independent dealers operated approximately 121 stores across 26 states and in Puerto Rico.

3.    I am over the age of eighteen (18) and am authorized by the Debtors to submit this Declaration.

4.    I have extensive experience in the retail industry dating back to 2007, when, after obtaining my Bachelor of Science in Business Administration from Washington University in St.

---

[1]    The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Sears Authorized Hometown Stores, LLC (9641) and Sears Hometown Stores, Inc. (8358).  The Debtors' mailing address is 5500 Trillium Blvd. Suite 501, Hoffman Estates, IL 60192.

Louis and an MBA from Goizueta Business School at Emory University, I served as an associate merchandise planner at Macy's and was responsible for driving locations results and preparing location performance, trend analyses and action plans.  I thereafter spent six years at Saks Fifth Avenue in various roles, including Manager of Planning and Analysis from 2010 to 2012, where I was responsible for driving both pre-season and in-season financial planning and strategy processes and maintaining productive inventory levels to achieve gross margin goals.  In 2012 to 2014, I served as a Strategy Director at Saks Fifth Avenue, where I led and managed the development and implementation of multiple successful long-term strategies to maximize efficiencies and drive growth for Saks Fifth Avenue stores.

5.      In 2014, I served as a Finance and Strategy Director for Sears Holdings Corporation and soon after transitioned to the role of CFO of Kmart Apparel from 2014 to 2016.  In this role, I delivered targeted financial results, increasing operating profits by $100 million, among other achievements.  I then served as Senior Director of Financial Analytics and Strategy for Sears Holdings in 2016 to 2018 and Apparel CFO of Sears Holdings from 2018-2019, where I served as the operating CFO of a $4 billion business unit and was responsible for the achievement of business unit financial goals for merchandising, inventory management, marketing and other categories.

6.      Beginning in 2019 through 2021, I served as the Retail CFO for Transform SH Holding Management LLC ("**Transform Management**") and, from 2021 through the present, I serve as Head of Retail for Transform Management.  It is through this role that I began to work with the Hometown Stores leadership team in August of 2021 as we looked to partner on initiatives and find efficiencies across the two companies.  Starting in March 2022, I was asked to help the Sears Hometown Stores leadership team to improve trends.  I became CEO of the Debtors in May

2022, and, as such, am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and restructuring efforts.

7.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team, the Debtors' employees or the Debtors' advisors, my review of the relevant documents and information concerning the Debtors' operations, financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

8.      I submit this Declaration: (a) to assist the Court and all parties in interest in understanding, among other things, the Debtors' operations, their corporate structures, and the circumstances that led to the commencement of these Chapter 11 Cases, (b) in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") on the date hereof (the "**Petition Date**"); and (c) in support of the relief that the Debtors request from the Court pursuant to the "First Day Pleadings" described in this Declaration.

## I.      DESCRIPTION OF THE DEBTORS' STRUCTURE AND BUSINESS OPERATIONS

9.      The Debtors' "corporate structure," is as follows: Debtor SAHS is a Delaware entity that is owned 100% by Debtor SHS. Debtor SHS is a Delaware corporation that is in turn owned by the following non-debtors in the following percentages: (1) ESL Partners, L.P. (9%), (ii) Edward S. Lampert, (37.75%), (iii) Hometown Midco LLC (45.23%), and (iv) Thomas J. Tisch and certain of his affiliates (8.03%)[2].

---

[2]      The Debtors do not have detail as to the identities of the "affiliates" of Thomas J. Tisch but believe these affiliates are family members, related trusts and/or investment vehicles.

10.    As noted above, SHS and SAHS distribute products through approximately 121 "Sears Hometown Stores," which are locally owned and operated businesses that offer the largest selection of the trusted names in home appliances, lawn and garden equipment, and tools.

11.    As of the Petition Date, all Sears Hometown Stores are operated by independent dealers pursuant to the terms of a Store Agreement.  Under the dealer model, the Debtors provide inventory (on a consignment basis), branding and marketing to the stores and the dealers are responsible for start-up costs, lease payments and other store operating costs, including payroll.  The Debtors regularly evaluate the performance of their dealer stores and require compliance with established customer service and other operational guidelines.

12.    The Debtors pay commissions to dealers that are based on the net sales of merchandise and extended-service plans.  In addition, each dealer can earn marketing support, home improvement referrals and other items.  Commission costs were $39.1 million, $49.4 million, and $68.3 million in fiscal years 2021, 2020, and 2019, respectively.  Commission costs vary based on factors such as store count, the number of dealer and franchise locations, sales mix, volume and commission rates.  Prior to the Petition Date, Dealers earned a 9.25% commission on the sale of inventory and a 9.25% of the sale of extended-service plans.

13.    Leases. The Debtors do not own any real property.  Rather, as of the Petition Date, the Debtors were party to non-residential real property leases for the following locations:

| Location | Landlord | Lessee |
|---|---|---|
| Market Basket Plaza, 11 West Swanzey Road, Swanzey, NH | Demoulas Super Markets, Inc. | SAHS |
| 714 N. Main Street, Spearfish, SD | Kazco Properties, LLC | SAHS |
| 15890 Southwest Freeway, Suite 100, Sugar Land, TX | Lake Pointe Shopping Center, LP (as successor to Lake Pointe Town Center, Ltd.) | SAHS |

| 505 N. Pearl, Kittitas, WA | Patry, Andrew | SAHS |
|---|---|---|
| Shopping center in Dekalb, IL | Sycamore Center Dekalb, LLC | SAHS |
| 6077 South Packard Ave., Cudahy, WI | TF Cudahy WI LLC | SAHS |
| 1611 Virginia Ave., North Bend, OR | Yoo Jin Lodging, Inc. | SAHS |

14.     All of the stores at the above locations were "dark" as of the Petition Date and the Debtors are not using the spaces with the exception of the Cudahy, Wisconsin space, at which the Debtors are storing certain personal property.   Most of these "dark store" locations were for stores that the Debtors had operated themselves and for which the Debtors had hoped to transfer to a third-party dealer, similar to their other, more typical arrangements.   Ultimately, the stores were not profitable and no dealers could be located.   As such, these locations were closed and the locations remain dark.   With respect to the North Bend, Oregon location, the Debtors announced the closing of the store in early December and anticipate that they will vacate the space on or before December 16, 2022.

15.     Because these locations are unused and/or no longer needed, the Debtors intend to reject the leases associated with these locations during the course of these Chapter 11 Cases, effective as of the Petition Date or the date upon which the Debtors vacate the premises.   Such relief is critical in permitting the Debtors to avoid burdensome administrative costs that will hamper their efforts to restructure efficiently and in a manner that will maximize recoveries to stakeholders.

A.     **The Debtors' Relationship with TransformCo**

16.     The Debtors have a long history with several "Transform" entities referred to collectively herein as "**TransformCo**." SHS (f/k/a Sears Hometown and Outlet Stores, Inc.) separated from Sears Holdings Corporation ("**Sears Holdings**") in October 2012.   Sears Holdings

40829337.5

thereafter eventually became Transform Holdco LLC ("**Transform**") when, on February 11, 2019, Transform, which is an affiliate of ESL Investments, Inc. (together with its affiliates, including Edward S. Lampert, "**ESL**"), acquired substantially all of the assets and assumed the related operative agreements and obligations of Sears Holdings during the course of its bankruptcy proceeding.

17.    On October 23, 2019, SHS completed the sale (the "**Outlet Sale**") of its Sears Outlet and Buddy's Home Furnishing Stores businesses.  Immediately following the consummation of the Outlet Sale, pursuant to the terms of an agreement and plan of merger dated as of June 1, 2019 between SHS, Transform and Transform Merger Corporation ("**Merger Sub**"), Merger Sub merged with and into SHS, with SHS as the surviving corporation (the "**Merger**").

18.    At the completion of the Merger, ESL effectively owned approximately 95% of SHS and a majority of Transform.  In addition, effective upon completion of the Merger, the certificate of incorporation of Sears Hometown and Outlet Stores, Inc., as in effect immediately prior to the Merger, was amended and restated to, among other things, change the name of Sears Hometown and Outlet Stores, Inc. to SHS (i.e. Sears Hometown Stores, Inc.).

### (i)    Inventory and Services Provided by Transform

19.    TransformCo provides critical inventory and services to the Debtors in connection with their operations.  These arrangements are governed primarily by the following: (i) the Amended and Restated Merchandising Agreement dated May 1, 2016 (as amended, the "**Merchandising Agreement**"), (ii) the Services Agreement (as defined below), and (iii) the Transform Loan Agreement (as defined below).

20.    The Merchandising Agreement. Pursuant to the Merchandising Agreement between Transform SR LLC, Transform KM, LLC, Transform SR Holdings LLC and Transform

SR Holding Management LLC (as assignees of Sears Roebuck & Co., Kmart Corporation and Sears Holdings, the "**Sellers**") and SHS, SAHS and non-debtor Sears Outlet Stores, L.L.C., a non-operating entity (together, the "**Buyers**"), the Buyers purchase from the Sellers (which in turn purchase the items from third party vendors) a wide variety of products that the Buyers in turn sell at their store locations, such as furniture items, sporting goods, houseware, appliances, certain apparel and toys, among other items.  In addition to invoicing the Buyers for the product purchased, the Merchandising Agreement also provides for the Buyer's payment of commissions and royalties to the Sellers in connection with the sales of certain specified types of products.  As of the Petition Date, the Debtors estimate that approximately $17.8 million is owed to the Sellers in connection with the Merchandising Agreement (though certain of these amounts may be subject to dispute).

21.    The Services Agreement.  Transform Management provides certain buying, distribution and administrative services to the Debtors on a centralized basis, including finance, information technology, human resources, corporate services and other overhead functions, pursuant to a Services Agreement between Transform Management (as assignee of Sears Holdings Management Corporation) and SHS dated August 8, 2012 (as amended, the "**Services Agreement**").

22.    In exchange for its services, SHS is obligated to Transform Management for annual, quarterly, monthly or hourly fees, depending upon the types of services at issue.  If not billed directly to SHS, these costs are allocated to SHS to approximate its proportionate share of such costs and expenses.  Allocated costs and expenses include shared occupancy space and business process outsourcing.

23.    Amounts due to Transform Management are non-interest-bearing, settled on a net basis, and have payment terms of ten (10) days after the invoice date.  Transform Management

invoices the Debtors on a weekly basis. The Debtors had $15.1 million in net payables due to Transform as of January 29, 2022. As of January 29, 2022, $4.5 million of the outstanding amount payable to Transform Management was initially due prior to year-end but was deferred into 2022 with no stated due date.

24.     As of the Petition Date, the Debtors estimate that approximately $3 million is owed to Transform Management under the Services Agreement (though portions of this amount may be disputed).

25.     <u>Services Provided by Hometown Stores to Transform</u>. The Debtors also receive fees from Transform Management for providing management services to Transform Management. Specifically, pursuant to separate service agreements between Transform Management and SAHS, SAHS provides Transform Management with my services (as Vice President of Retail), the services of James Coutre (as Senior Director, Business Finance) and Kevin Schwendeman (as Director of Inventory Management) in exchange for a monthly fee.

26.     Debtor SHS also receives commissions from Transform for specified sales of merchandise made to dealers through www.sears.com, the sale of extended-service plans, delivery and handling services and the use of credit cards branded with the Sears name in the Debtors' stores.

27.     Clearly, as set forth above, the Debtors rely substantially on TransformCo to provide key products and services. This heavy reliance makes it such that, in the circumstance that TransformCo is unwilling, unable or otherwise fails to provide these key products and services, the Debtors' businesses will be materially and adversely affected.

28.     As explained below, the Debtors' chapter 11 filing was precipitated, in part, by this very circumstance. With TransformCo unable and unwilling to provide further services and/or

40829337.5

inventory without assurances of payment for such services and inventory, and with PNC (as defined below) unwilling to lend further funds to buy new product given the Debtors' financial challenges, Transform declined to provide further inventory to the Debtors. This lack of inventory has caused a rapid downward spiral that contributed to the filing of these Chapter 11 Cases.

## II.    THE DEBTORS' CAPITAL STRUCTURE AND CREDIT FACILITIES

29.    The Debtors' pre-petition capital structure primarily consists of the following: (i) secured loans from PNC Bank, National Association ("**PNC**"); (ii) secured loans from Transform SR Acceptance LLC ("**Transform Acceptance**"); and (iii) unsecured obligations. The Debtors estimate their unsecured trade debt, as of the Petition Date, to be $2,250,000, which amount excludes obligations to TransformCo.

### A.    The PNC Credit Agreement

30.    In connection with the closing of the Merger, the Debtors, as borrowers, entered into a Revolving Credit and Security Agreement with PNC, as agent and lender, dated as of October 23, 2019 (as amended, the "**PNC Credit Agreement**"). The asset-based revolving loan credit facility provided in the PNC Credit Agreement consists of a $27.5 million revolving credit facility, a $7,500,000 subfacility for the issuance of letters of credit, and "Cash Management Products and Services" (as such term is defined in the PNC Credit Agreement), which were provided to the Debtors in accordance with the PNC Credit Agreement, including a purchasing card facility of up to $50,000.

31.    As of December 9, 2022, the Debtors were justly and lawfully indebted and liable, jointly and severally, under the PNC Credit Agreement in the aggregate principal amount of not less than: (A) approximately $22,699,950.00 in respect of loans and other financial accommodations made by PNC, comprised of the principal amount of Revolving Loans

outstanding under the revolving credit facility, plus (B) an amount of no less than $14,006.00 under the purchasing card facility, plus (C) an aggregate amount of $199,867.00 with respect to the face amount of issued and outstanding letters of credit issued for the benefit of the Debtors. The Debtors' obligations under the PNC Credit Agreement  are guaranteed by the Merger Sub. The term of the PNC Credit Agreement ends on October 23, 2024.

32.    The Debtors' obligations under the PNC Credit Agreement are secured by, among other things, first priority liens on, security interests in, and assignments and pledges of, all of the Debtors' right, title, and interest in the Debtors' receivables (including credit card receivables) and Inventory (as each such term is defined in the PNC Credit Agreement) and all rights and interests related to proceeds of Receivables and Inventory (to the extent provided in and as more fully described in the PNC Credit Agreement and other prepetition loan documents).  To perfect its security interests, PNC filed UCC-1 financing statements against the Debtors with the Delaware Department of State on October 23, 2019. and entered into a Deposit Account Control Agreement described below.

### B.    The Transform Loan Agreement

33.    The Debtors, as borrowers, entered into a term loan agreement with Transform Acceptance, as lender, dated as of January 26, 2022 (the "**Transform Loan Agreement**"). Transform Acceptance is affiliated with the Debtors through common ownership.  The Transform Loan Agreement provided for a $5 million term loan, which the Debtors used to pay down borrowings under the PNC Credit Agreement.

34.    The Debtors' obligations under the Amended Transform Loan Agreement (as defined below) are secured by a second priority security interest in the same collateral that is subject to PNC's first priority security interest under the PNC Credit Agreement.  To perfect its

security interests, Transform Acceptance filed UCC-1 financing statements against the Debtors with the Delaware Department of State on January 26, 2022 and entered into the Deposit Account Control Agreement described below.

35.     The Debtors and Transform Acceptance entered into an Amended and Restated Loan Agreement, dated as of July 20, 2022 (the "**Amended Transform Loan Agreement**") pursuant to which the principal amount of the loan was increased from $5 million to $15 million. The $10 million increase was requested by the Debtors to convert (i) an existing $1 million obligation owed to Transform SR Holdings, LLC, Transform KM LLC and Transform SR Holding Management LLC (together, the "**Inventory Sellers**") for inventory previously purchased by SHS and SAHS on trade credit (the "**Existing Receivable**"), and (ii) receivables from an additional $9 million in inventory to be purchased by SHS and SAHS from the Inventory Sellers (together with the Existing Receivable, the "**Subject Receivables**").

36.     Pursuant to the Amended Transform Loan Agreement, the increase in the principal amount of the loan was effectuated by: (i) the sale by the Inventory Sellers to the Debtors of the additional inventory in exchange for $9 million on the terms set forth in the Merchandising Agreement, (ii) the assignment by the Inventory Sellers of their right, title and interest in and to the Subject Receivables to Transform Acceptance in exchange for a receivable in equivalent amount from Transform Acceptance, and (iii) the conversion of the Subject Receivables into a new loan.

37.     The original  maturity date of the Transform Loan Agreement was October 6, 2022. On May 6, 2022, the maturity date was extended to December 6, 2022.

38.     Intercreditor Agreement. PNC and Transform Acceptance entered into an Intercreditor and Subordination Agreement, dated as of January 26, 2022, and an Amended and

Restated Intercreditor and Subordination Agreement, dated as of July 20, 2022 (together, the "**Intercreditor Agreement**"). In the Intercreditor Agreement, PNC and Transform Acceptance agreed, *inter alia*, that: (1) the priority of PNC's security interests in the collateral is senior and prior to Transform Acceptance's security interests in the collateral, and (2) the indebtedness under the PNC Credit Agreement is prior in right of payment to the indebtedness under the Amended Transform Loan Agreement.

39.    <u>Deposit Account Control Agreement</u>. SHS, as customer, PNC, as the "Bank" and "First Secured Party," and Transform Acceptance, as "Second Secured Party," entered into a Deposit Account Control Agreement dated as of July 20, 2022 (the "**DACA**").  In the DACA, the Bank acknowledges that SHS granted to the First and Second Secured Parties a security interest in deposit account number ended *4488 and all funds in the deposit account.

## III.    CIRCUMSTANCES LEADING TO THE FILING

40.    The Debtors' financial performance has suffered over the last few years from a number of factors, including declining sales, rising costs and the "hangover" from the COVID-19 pandemic. For the year ended January 29, 2022, SHS incurred recurring operating and net losses from continuing operations of $16.2 million and $18.3 million, respectively.  The Debtors undertook several steps since that time to try to improve performance including, (i) the closure of unprofitable stores, (ii) the optimization of resources, including a reduction in corporate and field expenses such as IT infrastructure costs and travel expenses, and (iii) the implementation of strategies to increase sales, including "Easy Order," a direct-ship sales arrangement with vendors. The Debtors also reached out to several potential strategic buyers in January 2022 to assess interest in the company.

41.    Notwithstanding these efforts, the Debtors' financial difficulties continued.  The PNC Credit Agreement includes an affirmative covenant that requires the Debtors to maintain certain "excess availability," as defined in the agreement.  The Debtors found themselves in breach of this covenant in mid-October 2022 and thereafter were placed in cash dominion and began discussions with PNC and Transform regarding restructuring alternatives.  At the same time, with obligations mounting, Transform requested assurances of payment before providing new inventory.

42.    In the absence of additional funding from PNC to purchase new inventory from TransformCo, and with TransformCo unwilling to provide inventory and services without assurances of payment, the Debtors found themselves in an untenable position, particularly given the heavy reliance of independent dealers on the sale of inventory received from TransformCo.  At the same time, a dispute arose between the Debtors and Transform over the amount of the Debtors' inventory that remain in Transform's control.  Attempts to resolve these disputes pre-bankruptcy were not successful.

43.    Given these disputes, and without the ability to access new inventory, the Debtors found themselves in a difficult position and ultimately determined that a chapter 11 proceeding would be the best mechanism through which the Debtors could (i) stem losses; (ii) orderly liquidate their inventory at the stores through inventory liquidation sales; (iii) provide some order and control over the sale process and their Dealer network; (iv) provide a forum for resolving their disputes with Transform; and (v) provide a forum for resolving any disputes or issues with their Dealers.

44.    In furtherance of these objectives, as described further below, the Debtors have filed a motion for approval of a Consulting Agreement dated as of  December 8, 2022, by and

between the Debtors and a joint venture comprised of Tiger Capital Group, LLC, B. Riley Retail Solutions, LLC and SB360 Capital Partners, LLC (the "**Consulting Agreement**") under which the Debtors would promptly begin inventory sales at their locations in a manner that the Debtors believe will best serve the interests of their dealers, creditors and other parties in interest.

## V.   OVERVIEW AND EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

45.     Contemporaneously with this Declaration, the Debtors have filed or expect to file a number of First Day Pleadings seeking orders granting various forms of relief intended to preserve value as the Debtors work to stabilize the Debtors' businesses, facilitate the efficient administration of these Chapter 11 Cases, lessen the impact of the Chapter 11 Cases on the Debtors' day-to-day operations and facilitate a successful chapter 11 plan for the Debtors.  I believe that this Court's approval of the relief requested in the First Day Pleadings is essential to avoid immediate and irreparable harm to the Debtors and their estates, to provide the Debtors with an opportunity to continue to meet their obligations in the ordinary course of business, to provide for a smooth transition into chapter 11, and to provide for the efficient and swift administration of these Chapter 11 Cases.  A description of the relief requested, and the facts supporting each of the First Day Pleadings, is set forth below.

<u>Administrative and Procedural Motions</u>

### A.     Motion for Joint Administration

46.     The Debtors have filed a motion for the entry of an order directing the joint administration of their Chapter 11 Cases.  As in many chapter 11 cases that are jointly administered, the Debtors' operations are integrated by nature, and each of the Debtors is liable for the Debtors' pre-petition and post-petition loans.  Joint administration of these Chapter 11

14

Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

     **B.**     **Application to Retain Claims and Noticing Agent**

    47.    The Debtors have filed an application for approval of the Debtors' retention and employment of Stretto, Inc. ("**Stretto**") as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware.  The Debtors anticipate that there will be more than 200 entities to be noticed in these cases.  It is my understanding that, in view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates and their creditors because the Debtors will be relieved of the burdens associated with Claims and Noticing Services.

     **C.**     **Motion for Authority to File Consolidated Creditor Matrix and Top 20 List**

    48.    The Debtors have filed a motion to file a consolidated creditor matrix and a consolidated list of their 20 largest unsecured creditors.  Therein, the Debtors request that the Court authorize the filing of a single consolidated list of their 20 largest general unsecured creditors and a consolidated creditor matrix.  I believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases.  Also, a consolidated list of the Debtors' top 20 creditors is more reflective of the body of creditors that have the greatest stake in the outcome of these cases.

**Operational Motions**

**A.**    **Motion for Approval of Use of Cash Collateral**

    49.    The Debtors have filed the *Motion of the Debtors for Interim and Final Agreed Orders (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*

15

(the "**Cash Collateral Motion**"), pursuant to which the Debtors request the entry of an interim order ("**Interim Order**"): (a) authorizing the Debtors to use the Cash Collateral (as defined in the Cash Collateral Motion) of the Secured Parties (as defined in the Cash Collateral Motion); (ii) granting adequate protection to the Secured Parties for the use of the Cash Collateral; (iii) modifying the automatic stay to the extent necessary to permit the Debtors and the Prepetition Secured Parties to implement the terms of the Interim Order; and (iv) granting related relief.

50.     The Debtors require immediate access to liquidity to ensure that they are able to continue operating their businesses during these chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and administer a value-maximizing chapter 11 process. However, all or substantially all of the Debtors' cash is Cash Collateral, and, without prompt access to such Cash Collateral, the Debtors would be unable to satisfy employee compensation obligations, satisfy trade payables incurred in the ordinary course of business, preserve and maximize the value of their estates, and fund the administration of these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

51.     During these chapter 11 cases, the Debtors will generate cash from their operations and will need to use such cash to satisfy payroll obligations, continue satisfying obligations under their customer contracts, maintain insurance coverage, pay taxes, and make any other payments essential to the continued management, operation, and preservation of the Debtors' businesses. The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of the chapter 11 cases.  Other than the Cash Collateral,  the Debtors do not have access to funds sufficient to continue operation of their businesses.

40829337.5

52.     For the foregoing reasons, the Debtors' continued use of Cash Collateral is necessary to preserve the value of their estates and maximize their value for the benefit of all stakeholders.  Under the proposed Interim Order, the Debtors' use of Cash Collateral is subject to certain limitations, including that the Debtors may only use Cash Collateral in accordance with the agreed upon budget attached as Exhibit 1 to the Interim Order, as may be modified from time to time with the consent of the Agent, in its reasonable discretion (the "**Approved Budget**").

53.     In addition, the Debtors and the Prepetition Secured Parties negotiated the proposed general terms of the Debtors' use of Cash Collateral in good faith and at arm's length.  I believe that the terms on which the Prepetition Secured Parties ultimately agreed to permit the Debtors to use Cash Collateral are the most favorable terms the Debtors reasonably could have achieved under the circumstances.

54.     As a condition to the use of Cash Collateral, the Prepetition Secured Parties required an adequate protection package consisting of Senior Adequate Protection Liens, an Adequate Protection Superpriority Claim, Adequate Protection Payments, Adequate Protection Fees, and certain obligations related to reporting and access to books and records, as described in greater detail in the Cash Collateral Motion and the Interim Order (collectively, the "**Adequate Protection**").  I believe that the proposed Adequate Protection will sufficiently protect the Prepetition Secured Parties from any diminution in value of the Prepetition Collateral during the pendency of these chapter 11 cases.

55.     Without access to Cash Collateral, the Debtors will be unable to continue operating. I believe the Adequate Protection is necessary and sufficient for the Debtors to continue to use Cash Collateral.  In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.  The

40829337.5

Debtors' proposed Adequate Protection is not only necessary to protect the Prepetition Secured Parties against any diminution in value, but is also fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral in the near term for the benefit of all parties in interest and their estates.

**B.      Motion to Continue Using Existing Cash Management System**

56.      The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts and Payment of Related Prepetition Obligations; (II) Waiving Certain Deposit Requirements; (III) Authorizing Continued Performance of Intercompany Transactions; (IV) Granting Administrative Expense Priority to Postpetition Intercompany Claims; and (V) Granting Related Relief* (the "**Cash Management Motion**").

57.      Prior to the Petition Date, and in the ordinary course of their business, the Debtors maintain a cash management system designed to, among other things, efficiently collect, concentrate, and disburse the funds generated by the Debtors' business operations.  As of the Petition Date, the Cash Management System included seven (7)  bank accounts, which are listed on Exhibit C attached to the Cash Management Motion (each a "**Bank Account**" and collectively, the "**Bank Accounts**"), all which are located at PNC Bank, N.A. ("**PNC**" or the "**Bank**").  The Debtors use six (6) Bank Accounts in the ordinary course of their businesses.  The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and between these Bank Accounts by various methods, including by checks, drafts, ACH transfers, and other electronic funds transfers.

58.      The Debtors' active accounts at PNC consist of (i) a store depository account (the "**Store Depository Account**"), (ii) a main operating account (the "**Operating Account**"), and (iii) a sales tax account (the "**Sales Tax Account**"), (iv) an account for credit card deposits (the

"**Credit Card Deposit Account**); (v) a miscellaneous collections account (the "**Miscellaneous Collections Account**"); and (vi) a payroll account (the "**Payroll Account**").

59.    Store Depository Account: All amounts received by the Debtors from their store locations (primarily deposits from stores operated by the Debtors' authorized dealers) are deposited into the Store Depository Account. Amounts in this account are swept daily to pay down the Debtors' credit facility at PNC. The average amount of each daily sweep is $225,00.

60.    Operating Account: Amounts in the Operating Account are used to fund payroll and other disbursements.   On a bi-weekly basis, amounts needed to fund payroll are swept by the Debtors' payroll processing vendor, Paychex, Inc. ("**Paychex**"), into a Paychex account.

61.    Sales Tax Account: Similarly, amounts needed to fund sales taxes are transferred to the Sales Tax Account, from which payments are made to the appropriate state taxing authorities. About $50,000 is swept daily into the Sales Tax Account to cover estimated sales tax obligations. The Debtors then undertake a "true up" each month based on actual sales, at which time additional funds may be transferred to the Sales Tax Account to cover any additional amounts required.

62.    Credit Card Deposit Account:  The Credit Card Deposit Account is holds deposits received from credit card processers that in turn receive deposits from customers using credit cards to purchase products at the Debtors' stores  Amounts in this account are swept daily to pay down the Debtors' credit facility at PNC.

63.    Miscellaneous Collections Account: The Debtors also maintain a Miscellaneous Collections Account that is generally used to collect receipts *other* than receipts from the Debtors' Stores. This account does not have daily activity and no amounts are held in the account at this

40829337.5

time.  To the extent that funds are deposited into the account, such funds are swept daily to pay down the Debtors' credit facility at PNC.

64.  <u>Payroll Account</u>:  Although, as noted above, the Debtors generally issue payroll amounts to Paychex via the Operating Account, the Debtors maintain a separate payroll account to the extent manual checks are needed.  This account, which is a zero balance account, does not have daily activity, and no amounts are held in the amount at this time.  To the extent manual payroll payments are needed, the Debtors transfer the requisite amounts into this account from the Operating Account.  To the extent that any excess funds remain after such payments are made, such funds are swept back into the Operating Account.

65.  <u>Business Forms and Checks</u>. In the ordinary course of business, the Debtors use a variety of checks, correspondence and business forms.  To minimize expenses to their estates and avoid unnecessarily confusing their employees and creditors, the Debtors believe it is appropriate to continue to use the existing stock of checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "**Business Forms**") as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors-in-possession – rather than disposing of the existing forms and delaying operations until new Business Forms are obtained. After existing Business Forms are depleted, the Debtors' Business Forms will identify the Debtors' status as debtors-in-possession.

66.  <u>Bank Fees</u>.  The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System.  These obligations primarily consist of amounts owed to PNC for the maintenance of and services related to the Bank Accounts (the "Bank Fees").  Bank Fees are typically paid on a monthly basis, and the Debtors have historically incurred

40829337.5

Bank Fees of approximately $4,000.00 per month.  Such amounts are paid by way of debit from the respective Bank Account for which the Bank Fee is incurred.   As of the Petition Date, the Debtors estimate that approximately $5,000.00 in Bank Fees have accrued and remain unpaid.  By the Cash Management Motion, the Debtors seek permission to pay these Bank Fees in the ordinary course and to continue paying the Bank Fees in accordance with past practices.

67.    Intercompany Transactions.   The Debtors have historically and in the ordinary course of business engaged in routine business relationships with each other and certain of their affiliates (the "**Intercompany Transactions**").   For example, as described above, Transform Management and certain of its affiliates provide inventory as well as logistics and other administrative services to the Debtors pursuant to the Merchandising and Services Agreements, respectively, in exchange for which the Debtors are obligated to compensate TransformCo.  The Debtors estimate that they pay TransformCo approximately $6.5 million per month for services and inventory under these arrangements.  Furthermore, pursuant to a separate Service Agreement with TransformCo, Debtor SAHS provides TransformCo with the services of certain of its employees in exchange for monthly fee**s**.

68.    The Debtors track all fund transfers in their accounting systems and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were discontinued, the Cash Management System and the Debtors' operations could be unnecessarily disrupted, to the detriment of the Debtors' estates, their creditors, and other stakeholders.  Accordingly, by the Cash Management Motion, the Debtors seek authority to continue, in the ordinary course, Intercompany Transactions between and among the Debtors and to accord administrative expense status to all receivables and payables arising postpetition from such Intercompany Transactions.

69.     As described above, the Debtors receive all revenues and make all payments through their Cash Management System.  If the Debtors are unable to maintain their Cash Management System, the Debtors' operations will be severely impeded.  Requiring the Debtors to adopt a new, segmented cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Any disruption of the Cash Management System could have severe adverse effects on the Debtors' restructuring efforts, the cost of which would ultimately be borne by the Debtors' creditors and other stakeholders.  Maintaining the current Cash Management System will facilitate the Debtors' smooth transition into and operation in chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.

**C.     Motion to Authorize Payment of Prepetition Employee Compensation and Benefits**

70.     The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Salary, Wages, Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs, and (II) Granting Related Relief* (the "**Employee Compensation Motion**").

71.     As of the Petition Date, the Debtors employ sixteen (16) employees (collectively, the "**Employees**"), all of which are full-time.  In the ordinary course of business, the Debtors pay for the Employees' salary, wages, and other forms of compensation that are described herein.

### 1.  Employee Compensation

72.     The following summarizes the various types of Employee compensation offered by the Debtors (collectively, the "**Employee Compensation**"):

73.     <u>Salaries and Wages</u>.   The Employees receive their salaries, wages and other compensation by direct deposit.  All of the Employees are salaried employees.  The total payroll for salaried Employees is approximately $120,000.00 per pay period.

74.     In the ordinary course of business, Employees are paid on a bi-weekly basis.  The next scheduled payroll for the Employees will cover the period of December 4, 2022 through December 17, 2022 and is scheduled for December 23, 2022.  The Debtors estimate that $41,000.00 of the next scheduled payroll for Employees will relate to amounts earned prior to the Petition Date, the entirety of which will come due within the first twenty-one days following the Petition Date (the "**Interim Period**").

75.     Because the Employees are paid in arrears, as of the Petition Date, some Employees may be entitled to compensation as a result of discrepancies between the amounts paid and the amounts that should have been paid.  Such amounts may not have been honored and paid as of the Petition Date.  The Debtors anticipate that such amounts would not exceed $2,500.00.

76.     <u>Annual Incentive Plan/Special Award Program</u>.  In the ordinary course of business, the Debtors have, in past years, offered an Annual Incentive Plan ("**AIP**") to eligible Employees whereby cash awards or other compensation was paid to such Employees based on the Debtors' operational and financial performance and such Employee's performance.  The Debtors have not implemented an AIP for 2022.  Rather, in lieu of an AIP, the Debtors offered certain employees a one-time "special award" (the "**Special Award Program**") in which the employees may receive a bonus in recognition of their contributions to the Debtors throughout the year so long as such

employees remain employed by the company through a specified date.  The award amounts are calculated as a percentage of the employee's annual salary.  To be clear, by the Employee Compensation Motion, the Debtors are not seeking approval for any amounts related to an AIP or the Special Award Program at this time but reference them in the motion solely to provide a comprehensive overview of the Debtors' employment policies and obligations.

77.  <u>Holidays/Paid Time-Off</u>.  The Debtors offer full-time Employees pay for predetermined holidays ("**Paid Holidays**").  In addition, Employees are eligible for paid time away from work based on length of service.  These absences include personal illness, family illness, personal days and vacation (together with the Paid Holidays, "**Paid Time Off**").  It is possible that, after the Petition Date, certain Employees may seek to use or redeem for cash Paid Time Off accrued during the prepetition period.  As of the Petition Date, the Debtors estimate that their accrued liability in connection with unused Paid Time Off for Employees is approximately $76,000.  By the Employee Compensation Motion, the Debtors request authority to honor all unused Paid Time Off for Employees that accrued prior to the Petition Date in accordance with their historical practices and in the ordinary course of business.  The Debtors also seek authority to continue to incur and pay eligible Employees for Paid Holidays consistent with past practices.

78.  <u>Overtime</u>. In the ordinary course of business, employees that were paid on an hourly basis were eligible for overtime pay ("**Overtime**") for any time worked in excess of forty (40) hours per week.  The amount of Overtime fluctuates from week to week depending on the demand. The Debtors do not believe any amounts are owed on account of Overtime as of the Petition Date but, out of an abundance of caution, respectfully request authority to pay any prepetition Overtime,

which the Debtors do not anticipate would exceed $600.00, and to continue to honor Overtime obligations as such amounts come due in the ordinary course of business.

79.     Based on the above, the Debtors estimate that, as of the Petition Date, approximately $120,100.00 in prepetition accrued wages, salaries, Uncashed Checks and Paid Time Off earned prior to the Petition Date remains unpaid and/or unused, approximately $79,100.00 of which is expected to come due during the Interim Period.  By the Employee Compensation Motion, the Debtors request authority to honor and pay such amounts when due, and to continue to honor such wage, salary, Paid Time Off and Overtime obligations (together, "**Employee Compensation**") in the ordinary course of business, consistent with pre-petition practice.

### 2.     Employee Deductions and Withholdings

80.     During each applicable payroll period, the Debtors routinely deduct certain amounts from the Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the Employee benefit plans discussed herein (e.g., garnishments, contributions relating to health care benefits, insurance premiums and flexible spending programs) and (b) other miscellaneous deductions (collectively, the "**Deductions**").  Out of an abundance of caution, by the Employee Compensation Motion, the Debtors request authority to remit any unpaid prepetition Deductions that exist. Additionally, the Debtors seek authority to continue deducting amounts from the applicable Employee's wages and salaries and forwarding Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices.  The Deductions represent earnings that applicable authorities have designated for deduction from Employees' paychecks and thus may not be property of the Debtors' estates.

25

81.     In addition to the Deductions, the Debtors are required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate taxing authority (collectively, the "**Withheld Amounts**").  The Debtors are also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "**Payroll Taxes**").

82.     On a bi-weekly basis, the Debtors remit approximately $40,000.00 in Payroll Taxes to the appropriate authorities, which amount includes employer taxes plus what is withheld and remitted on behalf of the employee.  As of the Petition Date, the Debtors estimate that they have approximately $10,000.00 in accrued and unpaid Payroll Taxes.  Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize the Debtors to transmit these amounts, the entirety of which will become due within the Interim Period, to the appropriate parties in the ordinary course of business.

### 3.     Employee Benefits

83.     The Debtors offer the Employees the opportunity to participate in a number of insurance and benefit programs, including medical insurance, life and disability insurance, workers' compensation, and other employee benefit plans as described below (collectively, the "**Employee Benefits**"). Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtors' workforce during the Chapter 11 Cases.

84.     <u>Medical, Dental and Vision Plans</u>.  The Debtors provide health care coverage and dental care to all full-time Employees and their dependents under various benefit plans, as described below (collectively, the "**Medical, Dental and Vision Plans**").

- *Medical Plans.*  Eligible Employees may enroll in one of several medical plans through Kaiser Permanente and Blue Cross and Blue Shield of Illinois. The

40829337.5

premiums, deductibles, and benefits vary by plan. The plans include pharmaceutical coverage. The monthly cost to the Debtors for the medical plans, including Employee contributions, is approximately $33,000.00.

- *Dental and Vision Plans.* The Debtors offer eligible Employees dental coverage through Cigna and a vision plan through EyeMed. The premiums, deductibles and benefits vary by plan. The monthly cost to the Debtors of such plans is approximately $1,800.00.

85. In the Employee Compensation Motion, the Debtors request authority to (a) continue the Medical, Dental and Vision Plans in the ordinary course of business, and (b) continue making the above-described contributions to the Medical, Dental and Vision Plans, in the ordinary course of business. The monthly premiums for the Medical, Dental and Vision Plans are generally paid monthly in the month in which services are rendered.

86. <u>Insurance and Disability Benefits</u>. The Debtors provide certain Employees with life insurance, accidental death and dismemberment and short-term and long-term disability coverage (collectively, the "**Insurance and Disability Benefits**"). The Debtors pay the premiums for Employees' basic life insurance and certain short-term disability coverage. The monthly premium for the Insurance and Disability Benefits is approximately $250.00 per month. The Debtors request authority to continue paying premiums for the Insurance and Disability Benefits in the ordinary course of business.

87. The Debtors also provide certain benefits to Employees pursuant to the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") in the ordinary course of business. On a monthly basis, the Debtors' obligations under COBRA are approximately $560.00 per month.

88. <u>Employee Savings Plans</u>. The Debtors maintain for the benefit of eligible Employees an employee savings plan, which is a tax-qualified plan within the meaning of, and administered in accordance with the requirements of, section 401(k) and other applicable sections of the Internal Revenue Code (the "**401(k) Plan**"). There are approximately 189 participants in

this plan, which is administered by Empower, including eleven (11) Employees.  The Debtors withhold certain amounts from participating Employees' paychecks and contribute such amounts to the 401(k) Plan (the "**Employee 401(k) Contributions**").  The Debtors withhold a total of approximately $6,600.00 per pay period in Employee 401(k) Contributions.  The Debtors request authority to continue the Employee 401(k) Contributions on a postpetition basis.  The Debtors also have in the past matched contributions to the 401(k) Plan, although this is discretionary. The Debtors request authority to continue matching the 401(k) contributions if they choose to do so, and if they choose to do so, will match 401(k) contributions with the same percentage contribution for all participating employees.

89.    Workers' Compensation.  In the ordinary course of business, the Debtors maintain workers' compensation insurance (the "**Workers Compensation Policy**") through the Phoenix Insurance Company.  Under the Workers' Compensation Policy, the Debtors are obligated to pay an annual premium that is calculated based on the Debtors' projected payroll, subject to certain additional debits or credits.  At this time, the Debtors have three (3) Employees receiving workers' compensation benefits. The Debtors believe they are current with respect to their workers' compensation obligations, and respectfully request authority to continue to honor any related obligations in the ordinary course of business.

90.    Severance Benefits. Prior to the Petition Date, the Debtors paid severance benefits to certain former employees (the "**Former Employees**") based on years of completed service at the time of termination.  Severance obligations are paid on the same bi-weekly schedule as other Employees and the amounts that the Debtors pay per pay period on account of severance obligations varies depending upon the amount of Former Employees left to be paid at any given time.  As of the Petition Date, nineteen (19) Former Employees are entitled to sums in connection

with severance obligations.  To be clear, by the Employee Compensation Motion, the Debtors do not seek authority to pay severance obligations to Former Employees.

### 4.    Reimbursable Expenses

91.    The Debtors also fund amounts that are applied to reimburse certain Employees for reasonable expenses necessarily incurred in the performance of their respective duties, such as travel expenses (i.e. mileage, parking and tolls), technology costs miscellaneous purchases for business-related goods or services and meal expenses incurred while performing company business (together with the BYOD Policy obligations and Credit Card Obligations (both as defined below), the "**Reimbursable Expenses**").  By the Employee Compensation Motion, the Debtors request authority to fund all unpaid Reimbursable Expenses incurred by the Employees as of the Petition Date (estimated to be approximately $5,000.00), consistent with and in the ordinary course of the Debtor's business.  The Debtors estimate that $5,000.00 of the Reimbursable Expenses will come due during the Interim Period.

92.    <u>Company Bring-Your-Own-Device and Technology Reimbursements</u>.  In the ordinary course of business, the Debtors have provided certain management-level Employees with a reimbursement to offset the cost of the technology necessary to perform job functions including a reimbursement under the Debtors' Bring-Your-Own Device-Policy (the "**BYOD Policy**"), under which the Debtors provide certain Employees with a company cell phone and/or a reimbursement for home internet service.  As of the Petition Date, nine (9) management-level Employees receive a monthly stipend of $65.00 under the BYOD Policy, six (6) Employees utilize a company-issued cell phone, and sixteen (16) Employees receive a monthly stipend of $25.00 for home internet service.  The Debtors seek to continue to provide these Employees with such technology and to continue to honor any obligations related to the BYOD Policy in the ordinary course of business.

93.    <u>Company Credit Cards</u>.  The Debtors currently have ten (10) company credit cards (the "Credit Card Obligations") through PNC Bank, N.A.  These cards are held by management-level Employees and are used for reasonable expenses necessarily incurred in the performance of their respective duties, such as travel expenses (*i.e.* mileage, parking and tolls) and meal expenses incurred while performing company business.  The maximum balances on the credit cards are $10,000 and the Credit Card Obligations typically range from $10,000 to $60,000 per month.  As of the Petition Date, the Debtors estimate that there is $5,000 owed on account of the Credit Card Obligations, the entirety of which is expected to come due during the Interim Period.  By the Employee Compensation Motion, the Debtors  request authority to pay such amounts when they come due and the honor any post-petition Credit Card Obligations going forward, in the ordinary course of business.

5.    **The Payroll Processor**

94.    To process the payroll for the Employees, the Debtors use Paychex, Inc. ("**Paychex**") as their payroll processor.  The funds used for gross payroll are transferred from the Debtors' operating account to Paychex's respective payroll account two (2) business days prior to each payroll date.  On average, the Debtors pay $3,000.00 per month to Paychex in payroll processing fees.  As of the Petition Date, the Debtors believe that approximately $750.00 will be due to Paychex on account of pre-petition payroll processing services, the entirety of which is anticipated to come due during the Interim Period.  Because the services provided by Paychex are crucial to the smooth functioning of the Debtors' payroll system, the Debtors request permission to pay such fees to Paychex and to continue to pay fees that accrue during the ordinary course of business.

40829337.5

95.     I believe that payment of the foregoing Employee Obligations is critical to the ongoing operation of the Debtors' businesses.  If these obligations are not paid, the Debtors will risk tangible and intangible loss of the value of their businesses, including, among other things, losses relating to the cost of replacing Employees who seek alternative employment and losses related to the disruption of, and lower productivity in, the Debtors' business operations resulting from low employee morale and high turnover in an already extremely challenging employment market.

**D.     Motion to Approve Proposed Adequate Assurance of Payment to Utility Companies**

96.     The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* (the "**Utilities Motion**").

97.     In the ordinary course of business, the Debtors obtain traditional utility services related to the day-to-day operation and/or maintenance of their businesses from approximately nine (9) different utility providers (each a "**Utility Company**" and collectively, the "**Utility Companies**"), for water, electricity, gas, trash, waste disposal, telephone and internet services (the "**Utility Services**"). The Utility Companies include, without limitation, the entities set forth on the list attached to the proposed orders approving the Utilities Motion as Exhibit 1 (the "**Utility Companies List**").

98.     Uninterrupted Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to the success of their Chapter 11 Cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors'

31

restructuring efforts.  Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to function as a going concern.

99.     The Debtors estimate that the cost for the Utility Services during the next month (not including any deposits to be paid, and based upon the recent average monthly expenses for the Utility Services) will be approximately $3,820.00.  The Debtors intend to pay their undisputed postpetition obligations to the Utility Companies on a timely basis and have the ability to do so. The Debtors anticipate that they will have sufficient funds to pay the amounts described in this Motion.

100.    Within 20 days of the Petition Date, the Debtors propose to deposit $3,820.00, an amount equal to approximately one month of Utility Services, calculated as an average over the course of the 12 months prior to the Petition (the "**Adequate Assurance Deposit**") into a segregated bank account designated for the Adequate Assurance Deposits (the "**Adequate Assurance Deposit Account**") on behalf of all Utility Companies identified on the Utility Companies List.  The Adequate Assurance Deposit may be applied to any postpetition defaults in payment to the Utility Companies.  All funds held in the Adequate Assurance Deposit Account shall be returned to Debtors upon the earliest to occur of: (a) confirmation of a Chapter 11 plan of reorganization or liquidation with respect to the Debtors; (b) the closing of a transaction or series of transactions that in aggregate result in the sale of substantially all of the Debtors' assets; (c) conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (d) dismissal of these Chapter 11 Cases; or (e) conclusion of these Chapter 11 Cases.

40829337.5

### E.    Motion to Approve Payment of Taxes and Fees

101.    The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* (the "**Tax Motion**"), by which the Debtors seek authority to pay certain prepetition and postpetition taxes and fees.

102.    The Debtors collect, withhold, and incur a variety of taxes and fees in the ordinary course of their businesses, including sales and use taxes, gross receipts taxes, property taxes, franchise taxes, corporate taxes, as well as other business and regulatory fees (collectively, the "**Taxes and Fees**").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "**Authorities**").

103.    Taxes and fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.  The Debtors pay taxes and fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually or annually of each year, depending on the nature and incurrence of a particular tax or fee.  As of the Petition Date, the Debtors estimate that they owe approximately $1,636,031.00 in Taxes and Fees relating to the prepetition period, approximately $525,000.00 of which will become due and owing within the Interim Period.

104.    <u>Sales and Use Taxes</u>. The Debtors incur, collect, and remit sales taxes to the Authorities in connection with the sale and distribution of their products.  Additionally, the Debtors purchase a variety of equipment, materials, and supplies necessary for the operation of their businesses from vendors who may not operate in the state where the property is to be delivered and, therefore, do not charge the Debtors sales tax in connection with such purchases.  In these cases, applicable law typically requires the Debtors to subsequently pay use taxes on such

40829337.5

purchases to the applicable Authorities.  The Debtors generally remit sales and use taxes on a monthly basis.  As of the Petition Date, the Debtors estimate that they will owe approximately $690,000.00 to the relevant Authorities on account of prepetition sales and use taxes, $520,000.00 of which will become due and owing during the Interim Period.

105.    <u>Property Taxes</u>.  State and local laws in the jurisdictions in which the Debtors operate generally grant Authorities the power to levy property taxes against the Debtors' real and personal property.  In some instances, the Debtors lease property and pay property taxes to the landlords who then remit the property taxes to the applicable Authority.  To avoid the imposition of statutory liens on their real and personal property, the Debtors pay property taxes in the ordinary course of business on a quarterly or annual basis based on the jurisdiction.  As of the Petition Date, the Debtors estimate that they owe approximately $670,000.00 to the relevant Authorities on account of property taxes, none of which is expected to become due and owing during the Interim Period.

106.    <u>Franchise and Income Taxes</u>. In the ordinary course of operating their businesses, the Debtors have pay certain franchise and income taxes and related payments to various state taxing authorities in connection with operating in the applicable taxing authorities' states.  The Debtors must pay franchise taxes so that they can operate their businesses in the applicable taxing jurisdiction.  Franchise taxes are typically paid annually or quarterly to the applicable Authorities. As of the Petition Date, the Debtors estimate that approximately $269,031.00 in Franchise and Income Taxes have accrued and remain unpaid.  Of this amount, the Debtors forecast that approximately $3,300.00 of the accrued and unpaid prepetition Franchise and Income Taxes will become due during the Interim Period.

40829337.5

107.    <u>Gross Receipts Taxes</u>. State and local laws in the jurisdictions in which the Debtors operate generally grant Authorities the power to levy gross receipts taxes applied to a company's gross sales.  As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $87,000.00 in gross receipts taxes that have not been remitted to the relevant Authorities, approximately $50.00 of which will become due and owing during the first month of these Chapter 11 Case.

108.    <u>Regulatory and Licensing Fees</u>. In the ordinary course of the Debtors' operations, the Debtors are obligated to pay a variety of regulatory and licensing Fees, as well as fees related to the operation of their retail business.  The Debtors estimate that $700 in Fees is outstanding as of the Petition Date, the entirety of which is expected to come due during the Interim Period.  By the Tax Motion, the Debtors seek authority to pay such amounts, and to continue to pay such Fees as they become due in the ordinary course of the Debtors' businesses.

109.    I believe that any failure to pay the Taxes and Fees may materially disrupt the Debtors' business operations in several ways: (i) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (ii) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (iii) the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both.  For the foregoing reasons, I believe that it is in the best interests of the Debtors' estates that the Debtors be authorized to pay the Taxes and Fees.

40829337.5

**F.      Motion to Honor Insurance Obligations**

110.    The Debtors have filed the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, including Broker Fees, (B) Renew, Supplement, or Purchase Insurance Policies, and (C) Honor the Terms of the Premium Finance Agreement; (II) Authorizing Banks to Honor and Process Checks and Electronic Transfers Requested Related Thereto; and (III) Granting Related Relief* (the "**Insurance Motion**"), authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto, including broker fees, (ii) renew, supplement, or purchase insurance policies in the ordinary course of business, and (iii) honor the terms of the Premium Financing Agreement (as defined below) and pay premiums thereunder; (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing, and (c) granting related relief.

111.    In the ordinary course of business, the Debtors maintain approximately fourteen (14) insurance policies (collectively, the "**Insurance Policies**") that are provided and/or administered by multiple third-party insurance carriers (collectively, the "**Insurance Carriers**"). The Insurance Policies include, among other things, general liability, automobile, workers compensation, umbrella, excess liability, property, stock throughput, directors and officers, crime, employment practices, and fiduciary liability insurance.   A schedule of the current Insurance Policies, policy terms, and annual premium amounts is attached to the Insurance Motion as Exhibit "C."   In general terms, the Debtors' coverage can be described as follows:

- <u>General Liability Insurance</u>. The Debtors maintain general commercial liability insurance policies that provide coverage relating to, among other things, personal injury liability, property damage, crime, workers' compensation liability, employment practices and fiduciary liability, stock throughput, and automobile-related liability (collectively, the

40829337.5

"**General Liability Insurance Policies**").  The General Liability Insurance Policies also include umbrella insurance coverage and excess liability policies.  The aggregate annual premium paid for the Liability Insurance Policies is approximately $635,000.

- D&O Insurance.  The Debtors maintain insurance policies for their directors and officers (collectively, the "**D&O Insurance Policies**").  The aggregate annual premium for the D&O Insurance Policies is approximately $425,606.00.

112.    Insurance Premiums and Related Finance Payments.  The Debtors pay for the cost of insurance two ways.  First, in certain instances, they pay premiums in the ordinary course of business (*e.g.*, monthly, quarterly, or annually) from immediately available funds.  Alternatively, in instances where it is economically advantageous to do so, the Debtors finance premiums through Insurance Premium Financing Solutions ("**IPFS**").  In the case of the financed policies (the "**Financed Policies**"), the finance agreement (the "**Premium Financing Agreement**"), a copy of which is attached to the Insurance Motion as Exhibit "D," requires the Debtors to make an initial down payment followed by installments until the balance is paid in full ("**Financed Payments**").

113.    The Debtors' obligations under the Financed Policies are secured by, among other things, any benefits paid and any additional premiums due under those policies, including dividends, gross unearned premiums, and payments on account of losses that result in a reduction of unearned premiums.  As of the Petition Date, the Debtors believe that they owe approximately As of the Petition Date, the Debtors believe that they owe approximately $37,000.00 on account of pre-petition insurance obligations, including obligations owed in connection with the Premium Finance Agreement, approximately $10,000 of which will come due in in the first twenty-one (21) days following the Petition Date (the "**Interim Period**").  The Debtors respectfully request authority to pay all outstanding amounts in connection the Insurance Policies.

114.    Insurance Brokers. The Debtors procure their Insurance Policies through CAC Specialty, an affiliate of Cobbs Allen & Hall, Inc. (the "**Insurance Broker**").  The Insurance

40829337.5

Broker assists the Debtors in obtaining comprehensive insurance coverage at competitive rates by evaluating benefit plan offerings.  The Insurance Broker collects commissions when the Debtors purchase coverage or when they remit premiums or Financed Payments.  Such commissions are typically 15% of the premium amounts required to be paid under a particular invoice.  Any outstanding brokerage fees as of the Petition Date are included in the estimate of outstanding insurance obligations set forth above.  The Debtors, by the Insurance Motion, seek authority to honor any amounts owed to the Insurance Broker to ensure uninterrupted coverage under the Insurance Policies.

115.    Continuation of the Debtors' Insurance Policies, and entry into new insurance policies in the ordinary course of business, is essential to the preservation of the value of the Debtors' business and operations.  Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, to ensure uninterrupted coverage, by the Insurance Motion, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, honor their obligations related to the Premium Financing Agreement, and enter into new Insurance Policies in the ordinary course of business.

**G.    The Debtors' Motion to Assume the Consulting Agreement and Conduct Inventory Disposition and Similar Themed Sales**

116.    The Debtors have filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement; (II) Authorizing and Approving the Conduct of Inventory Disposition or Similar Themed Sales, with Such Sales to Be*

40829337.5

*Free and Clear of All Liens, Claims and Encumbrances; and (III) Granting Related Relief* (the "**Consultant Motion**").

117.    Through the Consultant Motion, the Debtors seek entry of an order, (i) authorizing the Debtors to assume the Consulting Agreement (as amended, modified, or restated, and together with all exhibits, the "**Consulting Agreement**"") by and between the Debtors and a joint venture comprised of Tiger Capital Group, LLC, B. Riley Retail Solutions, LLC and SB360 Capital Partners, LLC (collectively, the "**Consultant**"), (ii) authorizing the Debtors to continue inventory disposition or similar themed sales (the "**Inventory Sales**") in accordance with the terms of the inventory sale guidelines set forth on Exhibit 2 to the proposed interim order approving the Consultant Motion, with such sales to be free and clear of all Encumbrances (as defined in the Consultant Motion), (iii) authorizing the enhanced Dealers Incentives (as defined below), and (iv) granting certain related relief.

118.    Prior to the Petition Date, the Debtors' management, with the assistance of their advisors, performed an analysis of the Debtors' financial performance.  Such analysis included a comprehensive review of the performance of each store, the amount of Debtors' inventory on hand (the "**Merchandise**"), and the markets in which the Debtors operate.  As a result of this analysis, the Debtors determined that it is necessary to initiate an inventory sale disposition process with the assistance of the Consultant in order to best maximize the value of their estates for the benefit of all creditors.

119.    <u>The Debtors' Selection of the Consultant</u>.  To maximize the value of the Debtors' inventory on hand (the "**Merchandise**"), as well as certain furniture, fixtures and equipment ( the "**FF&E**" and, together with the Merchandise, the "**Sale Assets**"), the Debtors and their advisors contacted two leading national asset disposition firms (the "**Disposition Firms**") that specialize

in, among other things, the large scale sale of assets of the type owned by the Debtors.  Both Disposition Firms submitted a bid to serve as the Debtors' consultant.  Both bids contemplated asset disposition consulting agreements.

120.    After negotiations among the Disposition Firms and the Debtors with respect to the bids submitted by the two Disposition Firms, and after consultation with PNC, the Debtors, together with their advisors, determined that entering into the Consulting Agreement with the Consultant would minimize cost and maximize the value received from the Sale Assets.  Prior to the Petition Date, the Debtors and the Consultant executed the Consulting Agreement.

121.    The Consulting Agreement contemplates the sale of additional inventory of like kind and quality as the Merchandise (the "**Additional Inventory**").  Pursuant to the Consulting Agreement, the Consultant shall pay: (i) the Debtors an amount equal to five percent (5%) of the Gross Proceeds (excluding sales taxes) from the sale of the Additional Inventory (the "**Additional Inventory Fee**"); and (ii) all Dealer commissions on the sale of Additional Inventory.  The Consultant shall be responsible for all costs of insurance, if any, credit card fees, if any, and Dealers' commissions related to the sale of Additional Inventory.

122.    Furthermore, to provide the Dealers with incentives to participate and assist in the Inventory Sales, the Debtors, after consultation with their advisors, the Consultant and PNC, seek, in the Debtors' sole discretion, to (a) increase the Dealers' commissions on (i) the sale of the Debtors' inventory from 9.25% to either 12.5% or 15%, depending upon the type of products to be sold and (ii) the sale of extended-service plans from 9.25% to 20%; (b) pay each cooperating Dealer a one-time bonus of $7,500.00 at the conclusion of the Sale; and (c) exercise their discretion

40829337.5

to further increase Dealers' commissions, as necessary to maximize value (collectively, the **"Dealers Incentives"**).

123.    The assumption of the Consulting Agreement is beneficial to the Debtors' estates. As previously discussed, in order to maximize the value of their estates, the Debtors must sell the Merchandise as soon as possible, in an orderly manner.  Any delay in commencing the Inventory Sales will jeopardize the value that can be recovered during these bankruptcy cases.  In addition, the Consultant brings significant experience and expertise to assist the Debtors in conducting the Inventory Sales.  The Debtors and their advisors engaged in substantial efforts soliciting bids and negotiating with another national asset disposition firm before selecting the Consultant, and I believe that the terms set forth in the Consulting Agreement are the best alternative for the conduct of the Inventory Sales.  The terms of the Consulting Agreement are the results of arm's length bargaining and are the best terms available to the Debtors, as tested through a reasonable diligence process.

124.    The Consultant has extensive expertise in conducting asset disposition sales and can oversee, and assist in the management and implementation of, the Inventory Sales in an efficient and cost-effective manner.  Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Inventory Sales for the benefit of all stakeholders.  If the Consulting Agreement is not assumed on an interim basis, there will be tremendous harm to all stakeholders.  Delay in commencing the Inventory Sales would lead to loss of value and increased administrative expense.

125.    Furthermore, the Inventory Sales, if conducted on the expedited basis proposed in the Consultant Motion, represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Sale Assets.  There is a meaningful amount of Merchandise that, in the

aggregate, will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced asset disposition firm.

126.     The Dealer Incentive are likewise critical.  Unlike a more typical retail bankruptcy case, the Stores in this case are owned and operated by the Dealers, and not the Debtors. The Dealers, and not the Debtors, control the employees and the operations at the Stores.  In light of the Debtors' financial position, the Dealers are essentially losing their supplier and many Dealers are likely to experience their own financial hardships. The Dealers Incentives are thus critical and necessary to ensure Dealer cooperation and the success of the Inventory Sales.

127.     Lastly, to maximize the value of the Debtors' assets and to minimize the costs to the estate, the Debtors require authority to abandon any of their remaining Inventory or other property located at any of the Stores without incurring liability to any person or entity. While the Debtors are seeking to sell certain all Merchandise remaining in the Stores, the Debtors may determine that the costs associated with holding or selling certain Merchandise exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estate and/or may be burdensome to retain.

### H.     Motion to Pay Prepetition Obligations to Dealers

128.     Next, the Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Obligations to Dealers* (the "**Dealer Obligations Motion**") pursuant to which the Debtors seek the entry of an order authorizing the

Debtors to pay certain prepetition obligations to Dealers and to continue to honor such post-petition obligations to Dealers in the ordinary course of busines.

129.    As noted above, the Debtors pay certain amounts to the Dealers in the ordinary course of their businesses, namely: 8.In exchange for their services, the Debtors pay the following to the Dealers in the ordinary course: (i) commissions based on the Dealers' net sales of merchandise and extended-service plans (the "**Commissions**"); (ii) bonuses based on the Dealers' participation in store bonus programs and their ability to meet the targets required under such programs for the prior month, as described below (the "**Store Bonus Program Obligations**"); and (iii) reimbursements for delivery and installation costs that are incurred by the Dealers but paid by store customers to the Debtors (the "**Reimbursements**," and together with the Commissions and Store Bonus Program Obligations, the "**Dealer Obligations**").

130.    As of the Petition Date, the Debtors estimate that $176,000 in Commissions has accrued, the entirety of which is expected to come due within the Interim Period. The Debtors also estimate that approximately $75,000 in Reimbursements has accrued as of the Petition Date, the entirety of which will likewise come due during the Interim Period.

131.    With respect to the Store Bonus Program Obligations, the Debtors implemented a store bonus program in April 2022 for which Dealers accrued bonuses prior to the Petition Date. Specifically, under the "High Five" Store Bonus Program, Dealer stores were placed into three bonus tiers based on the combination of each store's historical merchandise sales volume and EBITDA.[3] Bonuses could be earned for each month so long as certain eligibility criteria were met and bonus "points" were earned for meeting benchmarks tied to: (a) comp sales (i.e. the total

---

[3]    The Debtors also implemented a "Game Changer" bonus program in April 2022 to encourage sales of home warranties and "smart home" initiatives; however, because the "smart home" initiatives were terminated shortly thereafter, the Debtors do not believe any bonuses were earned in connection with this program.

40829337.5

amount of all sales for the store, plus web-to-store sales occurring during the measured month); (b) protection agreement sales; and (c) "Sears Credit Share" sales (which measures sales using a Sears or SAHS-branded credit card).  As of the Petition Date, the Debtors estimate that $75,000 in Store Bonus Program Obligations has accrued; however, the Debtors do not anticipate that such amounts will come due during the Interim Period.

132.    The Debtors pay Commissions and Reimbursements to Dealers on a bi-weekly basis and Store Bonus Program Obligations to Dealers on a monthly basis.   Based on the above, as of the Petition Date, the Debtors estimate that they owe approximately $326,000.00 in Dealer Obligations to the Dealers relating to the prepetition period, $251,000.00 of which will become due and owing within the Interim Period.

133.    In the present case, I believe that the Debtors' ability to pay the Dealer Obligations to the Dealers is necessary to the Debtors' continued and uninterrupted operations, and to the success of their inventory sales.  As noted above, because the Dealers own and operate the Debtors' store locations, the Dealers' active participation in the sale process and cooperation with the Debtors and the Consultant are crucial.  Any risk of non-payment of the Dealer Obligations to the Dealers will not only impose further hardship on the Dealers, who rely heavily on the Dealer Obligations, but may impair morale and willingness to cooperate with the inventory sale process and the Debtors' wind down efforts in general, to the detriment of the Debtors' estates and creditors.  I therefore believe that the Debtors' decision to pay the Dealer Obligations to the Dealers is an exercise of the Debtors' sound business judgment and should be approved.

## I.    Motion to Honor Customer Obligations

134.    The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Honor Gift Cards and (II) Administer Existing Customer*

*Programs in the Ordinary Course of Business* (the "**Customer Programs Motion**").  By the Customer Programs Motion, the Debtors seek authority to honor Gift Cards (as defined herein); (ii) administer and honor Customer Programs (as defined herein) in the ordinary course of business; and (iii) continue, modify and/or terminate the Customer Programs as the Debtors see fit, in the ordinary course of business and without further application to this Court.

135.    Maintaining the loyalty and goodwill of their customers at their locations is critical to the Debtors' restructuring efforts.  The Debtors must maintain positive customer relationships and their reputation for reliability to ensure that their customers continue to patronize the Debtors' stores during the pendency of these Chapter 11 Cases.

136.    In order to retain and attract customers, the Debtors offer certain customer programs described below (collectively, the "**Customer Programs**").  The Customer Programs described below are typical of the Debtors' industry and, without the ability to continue the Customer Programs, the Debtors risk losing customer loyalty and goodwill, the results of which may jeopardize the Debtors' restructuring efforts.

137.    The Gift Card Program. The Debtors maintain a program (the "**Gift Card Program**") by which their customers can purchase pre-paid, non-expiring gift cards (the "**Gift Card(s)**") either in stores or online in various denominations ranging from $5.00 to $500.00 per Gift Card.  Gift Cards purchased may be redeemed at the Debtors' stores on or the Debtors' website.  The Debtors estimate that as of the Petition Date, approximately $35,000.00 in purchased and unredeemed Gift Cards is outstanding.  To ensure that the Debtors' customers can use their existing Gift Cards, the Debtors, by the Customer Programs Motion, seek authority to maintain the Gift Card Program after the Petition Date in the ordinary course and to honor all Gift Cards in the manner set forth in the Customer Programs Motion.

40829337.5

138.    As a result of the anticipated wind down of their operations, on the Petition Date, the Debtors ceased issuing Gift Cards at their locations and on their website.  The Debtors will continue to honor previously-issued Gift Cards at their store locations through the date of the store closure.  Customers are encouraged to use their Gift Card prior to the store closings.  Any customer who does not use his/her Gift Card at his/her local store prior to the closing may request a refund by simply calling customer service at 1-800-922-5660.  The customer will be instructed where to send the unredeemed Gift Card and asked for his/her name, address and phone number to process the refund.  Any refund request for a valid Gift Card will be honored.

139.    **The Debtors will honor any Gift Card refund request made during the pendency of these Chapter 11 Cases.**  The Debtors anticipate that refunds will be effectuated in thirty (30) days or less.

140.    <u>Return and Exchange Policies</u>. The Debtors maintain refund, return and exchange policies (collectively, the "**Return and Exchange Policies**") consistent with premium retail industry practice.  These policies can be found at https://knowledgecenter.searshometownstores.com/hts-return-policy.  The Debtors' Return and Exchange Policies give customers the ability to exchange or obtain a refund for most unused merchandise purchased through retail stores or the website within 30 days from the date of purchase.

141.    The Debtors intend to continue to honor the Return and Exchange Policies throughout this case for purchases made prior to the Petition Date.  The Return and Exchange Policies assure the Debtors' customers that they will be able to return or exchange merchandise that is damaged or defective, processed incorrectly, or otherwise unsatisfactory in accordance with existing policies.  The preservation of customer loyalty generated by the Return and Exchange

Policies outweighs the associated costs.  As such, by the Customer Programs Motion, the Debtors seek authorization to continue to honor the Return and Exchange Policies in the ordinary course of business with respect to merchandise purchased prior to the Petition Date.

142.    Notably, sales made *after* the Petition Date will be final in all stores that are closing. In order to make sure each and every customer understands that all sales are final, as soon as reasonably practicable after the filing the Debtors will (i) mark each receipt with the notation "All Sales Final," (ii) place signs in the closing stores that all sales are final, and (iii) instruct employees to advise customers at the point of purchase that all sales are final. In the event a customer believes a return should be accepted, the Debtors will work with the customer to ensure they are satisfied.

143.    <u>Sold But Not Delivered Merchandise</u>.  As described above, in the ordinary course of their businesses, the Debtors accept payment from customers for products that the Debtors must in turn order from TransformCo.  These products are then delivered either to a store for pick-up or sent directly to the customer.  From time to time, the Debtors will also accept payment from customers for product on-hand but for which the customer needs to retrieve at a later date.  As a result, as of the Petition Date, the Debtors have been paid for certain products that have not yet been delivered to, or retrieved by, customers, and are obligated to the customers to provide the products ordered (the "**Sold/Undelivered Merchandise Obligations**").

144.    To avoid any hardship to their customers, and to maintain customer goodwill, the Debtors seek authority in the Customer Programs Motion to honor and satisfy these pre-petition Sold/Undelivered Merchandise Obligations in the ordinary course. The Debtors estimate that the total amount of sold but undelivered merchandise as of the Petition Date is $2.3 million.  Of this amount, the Debtors believe that there is approximately $800,000 of inventory currently held at the Debtors' stores for customer pick up and/or located within the Debtors' inventory being held

40829337.5

by TransformCo.  The Debtors seek authority in the Customer Programs Motion to (a) fill existing customer orders with Debtors' owned inventory or (b) purchase the additional $1.6 million of inventory so that they may honor the Sold/Undelivered Merchandise Obligations to customers, and otherwise honor such obligations in the ordinary course going forward.

145.    The ability to continue administering the Customer Programs without interruption is critical to the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.  If the Debtors are unable to continue the Customer Programs as described herein, the Customers will not only experience hardships in not being able to use Gift Cards, return or exchange items or obtain product previously purchased, but the Debtors will risk alienating those Customers by failing to honor their obligations to them.  The corresponding losses in customer loyalty and goodwill that will arise in the event the Debtors cannot honor these obligations will in turn harm the Debtors' restructuring efforts.  Indeed, the success of the Debtors' inventory sales hinges on active customer participation at the Debtors' stores.

146.    The benefits of continuing to honor the Customer Programs further outweigh the minimal associated costs.  As such, the Debtors respectfully request the entry of the Interim and Final Orders authorizing the Debtors to continue to honor the Customer Programs in the ordinary course of business.

**J.      The Debtors' First Omnibus Rejection Motion to Reject Unexpired Leases**

147.    On the Petition Date, the Debtors will file the *First Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases and the Abandonment of De Minimis Property* (the "**Rejection Motion**"), (i) authorizing the Debtors to reject certain unexpired leases identified on the proposed order attached thereto effective as of the

40829337.5

later of (a) the Petition Date, or (b) the date on which the Debtors vacate the relevant premises and turn over the spaces to the relevant landlords, and (ii) authorizing the abandonment of De Minimis Property (as defined therein).

148.    Prior to the Petition Date, in the ordinary course of their businesses, the Debtors entered into several prepetition for non-residential real property identified on Exhibit 1 to the proposed order approving the Rejection Motion (collectively, the " **Rejected Leases**") with various counterparties (the "**Counterparties**").  Almost of the stores at these leased locations were "dark" as of the Petition Date.  These locations were for stores that the Debtors had operated themselves and for which the Debtors had hoped to transfer to a third-party dealer, similar to their other, more typical arrangements.  Ultimately, the stores were not profitable and no dealers could be located.  As such, these locations were closed and the locations remain dark.  With respect to the North Bend, Oregon location, the Debtors operated the store until early December, when closure of the store was announced and the Debtors wound down their operations at the store.

149.    The Debtors have reviewed and analyzed their leases and have determined that the Rejected Leases do not provide any value to the Debtors or their estates because the locations could not be operated profitably and are no longer being used.  The continued obligation to pay rent or otherwise perform under the Rejected Leases and conduct business at the locations to be rejected will thus impose upon the Debtors burdensome administrative costs that will be detrimental to the Debtors' restructuring efforts.  Given these circumstances, the Debtors believe that prompt rejection of the Rejected Leases as of the Petition Date is necessary and in the best

interests of the Debtors, their estates, and their creditors.  Indeed, rejection of the Rejected Leases will maximize the value of Debtors' estates and achieve significant cost savings for the estates.

150.    Having determined, in their business judgment, that it is in their best interests to reject the Rejected Leases, the Debtors, in advance of filing the Rejection Motion, began and, in most instances, completed, the process of vacating the restaurant locations and turning over the spaces to the respective Landlords.

151.    Although I believe that the Debtors will have removed all of their property from the relevant leased premises as of the proposed Rejection Effective Dates, the Debtors seek authority in the Rejection Motion to abandon any personal property, such as fixtures, furniture and other miscellaneous equipment, that may be left at the leased premises and that the Debtors have determined, in their business judgment, has little to no value to their estates (the "**De Minimis Property**").  The De Minimis Property that the Debtors propose to abandon is of inconsequential value to their estates.  The Debtors anticipate that any De Minimis Property that may remain on the premises would consist primarily of fixtures, furniture, and other miscellaneous equipment that the Debtors no longer require following the rejection of the Rejected Leases.  I further believe that the cost of retrieving, marketing and reselling the De Minimis Property far outweighs any recovery the Debtors could hope to attain for the property.  Thus, the Debtors have determined that the abandonment of any such De Minimis Property is in the best interests of the Debtors, their estates and their creditors.

I have reviewed each of the First Day Pleadings, the underlying operative documents and company records, the facts stated therein and the descriptions of the relief they request. I have reviewed same with the Debtors' executives and employees; together with the Debtors' counsel and advisors and based on such review believe that the contents of the First Day Pleadings and this

Declaration are true and correct to the best of my information and belief.  Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Pleadings and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated:  December  12, 2022

*Elissa Robertson*
_____
Elissa Robertson, CEO

40829337.5